**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-CR-287 (DLF)** |
| **NATHANIEL LAMAR NELSON SCOTT,** | |
| **Defendant.** | |

## GOVERNMENT'S MOTION FOR REVIEW OF RELEASE ORDER

The United States of America, by and through its undersigned counsel, respectfully appeals, and seeks this Court's review of, the magistrate court's July 8, 2024, Order denying its motion for pretrial detention. The magistrate court stayed its release order pending this appeal.

Defendant Nathaniel Scott poses an unmitigable risk to community safety and should be detained pending trial. In May 2024, the defendant met a man on a fetish website who, unbeknownst to him, was an FBI Online Covert Employee (OCE). The defendant messaged the OCE via an encrypted messaging application and discussed his interest in the sexual abuse of prepubescent children. During the conversation, the defendant claimed that he had viewed child pornography and had recently molested an eight-year-old girl during a game of hide-and-seek. On June 5, 2024, the defendant made plans to rape the man's purported six-year-old daughter. He then acted upon those plans, traveling from Maryland into the District of Columbia that evening for the purpose of raping the child. The defendant met the OCE at an agreed-upon location and was arrested shortly thereafter. He then participated in a custodial interview in which he admitted to chatting with the OCE and traveling into the District of Columbia but also sought to minimize his wrongdoing with self-serving and contradictory excuses. The defendant has been charged with travel with intent to engage in engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b).

The government sought pretrial detention, *see* 18 U.S.C. § 3142(f)(1)(A), for which there is

a rebuttable presumption given the offense, *see* 18 U.S.C. § 3142(e)(3)(E).  The magistrate court held a detention hearing on June 10, 2024.  The magistrate court agreed with the government that releasing the defendant to his parents' residence in Bowie, Maryland—where he was living at the time of the offense, and where home visits by Pretrial Services are not an option—would not be appropriate.  But the magistrate court also indicated that it would be open to releasing the defendant on certain conditions and alluded to *United States v. Willis*, No, 22-MJ-122—a child sexual exploitation case in which then–Chief Judge Howell had affirmed its release conditions on appeal.  Because the defendant in *Willis* had different life circumstances that do not exist here, the magistrate court twice continued the hearing to allow the defendant to try to replicate them.

On July 8, 2024, at the third and final detention hearing, the magistrate court denied the government's motion and ordered the defendant released to home detention at a to-be-determined rental property with the defendant's mother as third-party custodian.  The court granted the government's oral motion for a stay pending appeal.  On July 10, 2024, the court docketed its proposed release conditions, (ECF No. 11), and entered a Minute Order providing its rationale.

The magistrate court erred by not adequately considering the Section 3142(g) factors as they apply in this case, including the nature and circumstances of the charged travel offense.  It instead relied on a strained comparison to *Willis* and other factually dissimilar cases, all of which involve entirely online conduct.  No case cited by the magistrate court involves a defendant who acted on his online predatory behavior by traveling to rape a child.

The magistrate court's proposed release conditions are facially inadequate to assure community safety, and their viability—even in the short-term—is questionable.  The proposed conditions would require the defendant's mother to quit her job, rent another house over 50 miles away, and bear sole responsibility for acting as the defendant's jailer.  For reasons that follow, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

## BACKGROUND

A Task Force Officer with the Federal Bureau of Investigation (FBI)–Metropolitan Police Department (MPD) Child Exploitation and Human Trafficking Task Force (CEHTTF) is active on a fetish website in his capacity as an Online Covert Employee (OCE).  While many users of the site are pursuing lawful, adult sexual activity, law enforcement knows that individuals also use the site to pursue illicit sexual activity, including with children.  In May 2024, the OCE made several posts in a group on the fetish website.  The group is dedicated to communicating with other users outside the website using a certain end-to-end encrypted messaging application.[1]  In the posts, the OCE referred to himself as a "kinky daddy" and indicated he was looking for "very open-minded people" to explore similar interests on the encrypted messaging application.

An individual later identified as the defendant, Nathaniel Lamar Nelson Scott, sent the OCE a direct message on the fetish website, asking "So what are you looking to do with a perverse Daddy ?"  The OCE responded, "Looking to me[et] like minded and see where it goes . I am a very open taboo[2] dad here . Let me know if you wanna chat on [the encrypted messaging application]."  The OCE then provided his username, and on May 25, 2024, he and the defendant began messaging on the application.

A selection of the initial conversation follows on the next page.[3]

---

[1] When a chat is end-to-end encrypted, only the participants to that chat can see its contents. Because the application is unable to access the contents of the chat, it is not possible for the application to detect the discussion of child sex abuse or the transmission of child sex abuse material.   For this reason, individuals interested in the sexual abuse of children frequently prefer to communicate via applications offering end to end encryption.

[2] "Taboo" is a term commonly used by individuals with illicit sexual proclivities, including incest, the sexual abuse and exploitation of children, and child pornography.

[3] The government has submitted to the Court, via USAfx, screen recordings of the defendant's chat conversations with the OCE and a videorecording of the defendant's custodial interview.  The chats do not include child pornography but, as described below, include some instances of adult nudity.

**OCE:** I'm a taboo perv into taboo no limits[4]

**OCE:** I watch what I say on [the website], lots of squares

**OCE:** U a naughty dad too with young

**OCE:** B or g?

**SCOTT:** [replying to "I watch what I say on [the website], lots of squares"] Same here, I've learned my lesson, from [the website] and other places never can be too cautious Lol

**SCOTT:** I hate the hypocrisy tho! So many folk pretending

**SCOTT:** [replying to "U a naughty dad too with young"] Not a father no, not so lucky, just a Daddy Dom! Haha. I'm extremely taboo, also pretty much no limits, and I'm a Man.

**SCOTT:** If that changes things, I understand. Most of the naughty parents I've connected with on here only like talking to other parents. I get it

**OCE:** Yeah, I like to mostly talk to other parents and see where it goes , have shared live and that sort of thing. What do u perv too

**SCOTT:** Yeah I get it I'm not mad about it, just unfortunate for me haha

**OCE:** lol

**SCOTT:** I perv to boy and girls and lots of taboo stuff on twitter mostly

**SCOTT:** I have groomed a few

**OCE:** Nice

**SCOTT:** And I like em young

**OCE:** Mine is 6 [**SCOTT** reacted with a heart symbol]

**SCOTT:** That's the perfect age

**OCE:** Yes

---

[4] Individuals interested in the sexual abuse and exploitation of children often refer to themselves and their proclivities using the term "perv," which can be either a noun or a verb.  "No lims" is short for "no limits," which means just that—no limits.  Like taboo, no limits and perv are also term commonly used by individuals with illicit sexual proclivities.

**SCOTT:** 6 is one of my fav numbers

**SCOTT:** I seen Half that

**SCOTT:** I had a few young sluts I groomed

**SCOTT:** But never been lucky enough to play irl[5]

**SCOTT:** Just hoping one day I can find a pxdo[6] mommy or pxdo daddy that will let me play with them or have my own 1 day

**SCOTT:** I'm so horny rn[7] dude lol most thinking about your little girl

**OCE:** I'm out of town this weekend actually driiving

**SCOTT:** Are you into both sex or just girls? Do you like it's too?

**OCE:** Let's connect next week

**OCE:** I'm in dc u?

**SCOTT:** I'm into boys a little now too, but mid teens age range for them

**SCOTT:** [replying to "I'm in dc u?"] I'M in MD not to far from Dc tho

**OCE:** Ok

As the conversation continued, the defendant asked the OCE questions about his divorce and whether the mother of the OCE's purported six-year-old knew about the sexual abuse.

The conversation continued throughout late May and early June 2024. During the conversation, the OCE told the defendant, "sniffed daughters panties this morning and shot a load." The defendant reacted with a heart and replied, "Mmm bet those panties sm[e]ll so pure and makes your dick hard becuz its so naughty." The OCE responded, "Yes so tiny !" and sent a picture of a

---

[5] The initialism "irl" stands for "in real life."

[6] The term "pxdo" appears to be an intentional misspelling of "pedo," short for "pedophile." Individuals with illicit interests will often intentionally misspell certain words to avoid detection.

[7] The initialism "rn" stands for "right now."

penis next to a pair of girls underwear and a pink blanket.  The defendant later responded, "I want to smell those panties when they are fresh."

The defendant continued to ask the OCE questions about his abuse of his purported six-year-old daughter.  A portion of the conversation follows:

**SCOTT:** What's it like doing naughty thing with her

**SCOTT:** Is she welcoming and excited to be naughty or does she resist and protest verbally?

**OCE:** No , I don't do anything crazy to make her uncomfortable, she will jerk me off and suck it mostly and I'll will lick her and rub

**OCE:** Jerk off near her while touching [**SCOTT** reacted with a heart symbol]

**OCE:** What kind of porn u perv too [sic]

**SCOTT:** Lots of age play and incest stuff, loli[8] stuff and I'm also into BNWO/ interracial, misogyny /female objectification, interracial , corruption of innocence, messy/piss, Pet Play

**SCOTT:** [replying to "No, I don't do anything crazy . . ."] Does she get excited about play time

**OCE:** Yes , at times she does. She seems to be getting more into it

Following this conversation, the defendant asked if the OCE had ever let "someone else play" with his purported six-year-old daughter.  The OCE described a planned encounter that did not occur and remarked that it "[w]ould have been hot to see her with a strange cock."  The defendant responded, "Hmmm yeah that really close and really hot. I'd want to just watch at first," and then said, "Or just like be naked around and playing with myself or watch some porn together and see how it goes."

The defendant stated that "[b]athing would be suuuper hot," and asked if the OCE's purported daughter was still a virgin, as well as questions about her body type and vagina.  The

---

[8] The term "loli" is short for "Lolita" and is commonly used by individuals interested in prepubescent to early teenage girls, to include child pornography and child erotica.

defendant later stated, "It's all a fantasy at this point, but it would be hot for a mommy or daddy like you to kind of groom me in a sense to be more and more depraved. I'm cautious about it still, but taking to you is very seducing and exciting."

On the morning of June 5, 2024, the OCE told the defendant that his purported daughter would be with him that evening.  During the conversation, the defendant stated:

> . . . I was hoping you were more bi and open to paying with me a bit, which might help me feel more comfortable but I do[n't] even know if you're my type. . . . not gonna lie, there is a part of me that is nervous cuz like you said I never done it before but last week I groped an 8[9] and man I was so hard and filled with so much lust, I want to do it so bad and the way you do it is the perfect way , gentle and fun, I really admire you for that and happy for her. All little girls need pedo cock to help groom them and make them into good little sluts.

The OCE responded that he was not looking for one-on-one sexual contact with other men.

Below is an excerpt of the conversation that followed:

> **OCE:** But again, It sounds like your either skeptical or u[n]sure of what u would want to do, so I don't know. I went through it with the last guy. His suggestion was to meet at a public place close to my apartment and have me FaceTime her with him next to me with her pulling her shirt up or taking her pants off
>
> **SCOTT:** When up say unsure, like you mean what I want to do in person or what?
>
> **OCE:** Yes
>
> **SCOTT:** Like you, I don't want to get caught ofc[10] so yeah I'm cautious and nervous about that but I was also just trying to be respectful and not "pushy" but maybe I'm fucking up lol
>
> **OCE:** lol I understand

---

[9] The defendant claimed that he molested an eight-year-old girl during a game of hide-and-seek. The defendant stated that when he found her, he "just took a risk and tickled her" and "touched her all over."   The defendant said, "Low key I think she is aware of what I did and liked it have not been able to see her for a while but hope to soon" and "Next time I'll try more."   During his custodial interview, the defendant claimed that this was a fantasy he made up to ingratiate himself with the OCE.

[10] The term "ofc" is internet slang for "of course."

**SCOTT:** Yes if we are in person I'd want to introduce and maybe tickle her and grip her and molest her and kiss her then watch you too a bit then get comfy and lick her and rub my tip with you there to encourage me to embrace it and hope she has fun

**OCE:** Mmmm that would make me so hard

**SCOTT:** Yeah, so that's what I want

**SCOTT:** There, no more hesitation or indecisiveness

The OCE asked the defendant to "validate" himself by taking a picture in which he was holding four fingers up. The defendant sent a picture of four fingers over an adult male penis. The individual in the picture is an adult Black male. The OCE sent the defendant a picture of his purported daughter with her shirt raised.[11] The OCE stated, "If you want to do this , they best way is to meet by my place in public, then I can FaceTime her and her her [sic] show her pussy, then we head walk up to my apt." The defendant responded, "I want to lick every inch."

The OCE then discussed plans to meet up in the District of Columbia later in that evening. The defendant stated, "I was just thinking, like what about taking a bath? I think that is so hot." The OCE responded, "Yes I agree maybe a good way to start too, and the defendant responded, "can't wait." The defendant later indicated that he would not be taking a shower after work due to the plan to take a bath.

The OCE and the defendant agreed to meet at a bar in Northwest Washington, D.C. Shortly before the meeting, the OCE sent the defendant a picture of the shirt he was wearing. On June 5, 2024, at approximately 6:59 p.m., the defendant entered the bar and went straight to the bathroom. Upon exiting the bathroom, the defendant approached the OCE and shook his hand. The defendant ordered beers for himself and the OCE and sat next to the OCE at the bar. The defendant stated that he was from the Crofton, Maryland, area, and discussed sports with the OCE. After several

---

[11] The picture did not depict an actual child.

minutes, the OCE told the defendant that he was not trying to rush him but that they needed to get back to the apartment because the OCE's purported daughter was home alone.  The defendant acknowledged this, got up, and walked down the bar to get the bartender's attention and pay the tab.  The OCE informed the defendant that the bar was too crowded to FaceTime his daughter and that he would show her on FaceTime once they entered his apartment building, which he said was in the same block.  The defendant agreed and followed the OCE outside the bar, at which time he was arrested.  The defendant told arresting agents that he was just trying to leave.

The defendant waived his *Miranda* rights and participated in a custodial interview with CEHTTF members.  He admitted to driving into the District of Columbia from Maryland to meet a man he did not know but had been chatting with online.  (The defendant was not aware in the interview that the man was an undercover law enforcement officer.)  The defendant offered several self-serving explanations, some of which are contradictory.  He denied that he intended to abuse the child and explained that he was into role playing.  The defendant could not bring himself to say the age of the child but said that she was younger than a teenager and that she was probably too young to be left home alone.  He claimed that he did not know for certain whether the man with whom he had been speaking had a child.  He also claimed that he had changed his mind and that when he got outside of the bar, he had intended to tell the man it was not going to work out and then leave.

During processing, the defendant identified himself.  CEHTTF members also recovered the defendant's Maryland driver's license.

### Identification of the Defendant

Before his June 5, 2024, arrest, members of the CEHTTF had already identified the suspect who was communicating with the OCE as the defendant, Nathaniel Lamar Nelson Scott.  A member of the CEHTTF served an administrative subpoena on the fetish website for the username that contacted the OCE.  The website's response included, among other information, two Google

Gmail addresses, a verified telephone number with a 443 area code, and a date of birth later determined to be the defendant's.  A member of the CEHTTF then served an administrative subpoena on Google.  Google's response indicated that the recovery phone number associated with one of the accounts was the same phone number provided by the fetish website.  A member of the CEHTTF served an administrative subpoena for the phone number on T-Mobile.  T-Mobile responded that the number is subscribed to a woman with the initials S.H.  (Before his custodial interview, the defendant revealed that S.H. is his mother.)  The address on the T-Mobile account is the same address that is listed on the defendant's Maryland driver's license.  (Before his custodial interview, the defendant provided this address.)  In addition, a search of the phone number in commercial databases revealed that it is associated with Nathaniel Lamar Nelson Scott, a Maryland resident whose date of birth is the same date of birth the user provided to the fetish website.

### The Defendant's Access to Child Pornography

During the chat, the OCE asked the defendant if he had seen child pornography.  The defendant responded, "No, I'm kinda new to this, and I'M VERY VERY VERY cautious and most ppl don't share if you don't have anything to trade so yeah."  Later in the chat, however, the defendant indicated that he had previously viewed child pornography:

> Like I said, I don't really have anything lol I'm too scared to keep it on my phone, I had a few vids in old chats but I don't know how to send it without saving it, and I think I might have deleted those chats after getting paranoid

During his custodial interview, the defendant denied having child pornography on the two cellphones that were seized from him incident to his arrest but said he might have images of people posing as prepubescent children.  The defendant could not offer a coherent explanation for why he was carrying two phones.  The government promptly obtained a search warrant for the phones, but the FBI's efforts to obtain extractions have not yet been successful and remain ongoing.

## PROCEDURAL HISTORY

On Wednesday, June 5, 2024, the defendant was arrested upon probable cause after driving into the District of Columbia from Maryland and meeting the OCE in a bar.  That same evening, in accordance with Federal Rule of Criminal Procedure 5(b), the government applied for a criminal complaint and arrest warrant, which this Court issued the next morning.  (ECF Nos. 1, 3).  The defendant then made his initial appearance before the magistrate court.  On the government's motion, the defendant was held pending a detention hearing scheduled for June 10, 2024.  On June 9, 2024, the government filed a memorandum in support of its motion for pretrial detention.  (ECF No. 4).  The defense did not submit any filing or proposed release plan.

At the first detention hearing on June 10, 2024, the defense proposed that the defendant be released to home incarceration at his parents' residence in Bowie, Maryland, with his parents as third-party custodians.  The government opposed, noting that the defendant was living with his parents at this address at the time of the offense.  The government also raised concerns about the defendant's potential access to the internet and internet-connected devices, and the fact that the Pretrial Services for the District of Columbia does not do home visits.  Pretrial Services indicated that, were the defendant to live more than 50 miles from D.C., another District would assume courtesy supervision and do home visits.  The magistrate court alluded to *United States v. Willis*, No, 22-MJ-122—a  child sexual exploitation case in which then–Chief Judge Howell had affirmed its release conditions on appeal—and indicated it would be open to releasing the defendant on similar conditions.  The court gave the defendant until June 27, 2024, to propose a release plan.

On June 27, 2024, the parties appeared for the second detention hearing.  The defense indicated that it had identified several apartment units that were more than 50 miles from D.C. in Maryland.  The government objected, arguing that apartment communities were likely to have children present as well as numerous open Wi-Fi internet connections.  The government also made

clear that, although it raised specific objections, it opposed release on any conditions in this case. The magistrate court agreed that an apartment community was inappropriate, and it gave the defendant until July 8, 2024, to identify a different residence.

On July 8, 2024, before the hearing, the defense emailed the government and Pretrial Services a list of six addresses of single-family rental properties in Virginia, Maryland, and Pennsylvania, at least one of which is a short-term rental through Vrbo.com, a vacation rental site. The magistrate court also emailed the parties a copy of the release conditions in *United States v. Willis*, the case to which it had alluded during the two earlier proceedings.

At the third and final detention hearing on July 8, 2024, the defendant's mother testified that she would quit her job, rent another property, and supervise the defendant.  Under the proposed conditions, the defendant's stepfather, who works for the government, would have to use leave and travel to the location from Bowie, Maryland, to relieve the defendant's mother of her duties should she wish to leave the property for any reason.   The government argued that *Willis* was distinguishable because, while the defendant in that case used the internet to entice a 14-year-old girl to have sex with him, he never took the additional step of traveling across state lines to act on his online predatory behavior.  The government argued that this distinction was a significant one and cited *United States v. Dhavale*, No. 19-MJ-92, 2020 WL 1935544, at *1 (D.D.C. Apr. 21, 2020).  In *Dhavale*, the defendant used the internet to entice a purported 13-year-old girl and then actually travelled across state lines intending to have sex with her.  *See id.*  The defendant in *Dhavale* was detained for over a year before moving for release due to the COVID-19 pandemic. *See id.*  The magistrate court released the defendant on conditions, and the government appealed. *See id.*  In assessing the danger that the defendant posed to the community, then–Chief Judge Howell emphasized both the ubiquity of internet-connected devices and the fact that the defendant had actually traveled:

Defendant's alleged criminal conduct here, including reaching out to a purported child, soliciting the production of child pornography, and engaging in the planning and discussion of sexual abuse, was electronically based. Given the ubiquity of internet-capable devices and defendant's skill in usage, the danger presented by his release to the community is obvious, particularly considering the representation made by Pretrial Services in this and similar cases that Pretrial Services cannot effectively monitor and ensure compliance with a "no internet-capable electronic devices" condition.  Moreover, the government's proffer demonstrates that defendant actually traveled to Washington, D.C. with the intention of engaging in illicit sexual acts with the purported child.  Accordingly, this factor, too, weighs on the side of pretrial detention of defendant.

*Id.* at *4.[12]  Even though the defendant in *Willis* never traveled, the magistrate court rejected this argument, asserting that, in its view, then–Chief Judge Howell's concern in *Dhavale* was about access to electronics, which would be addressed here by home visits in another jurisdiction.

In addition, the government argued that the release conditions in *Willis* were different for several reasons.  First, the defendant in that case had two custodians—his retired parents—in a home they owned for over thirty years.  Those conditions are much more stable than the proposed conditions here, which would require the defendant's mother to quit her job, rent a property over 50 miles away, and supervise the defendant entirely on her own.   Second, the defendant in *Willis* was required to undergo a psychosexual evaluation and begin sex offender treatment, which is something he proposed.

The government further argued that the defendant's mother, while undoubtedly well intentioned, lacks objectivity and is otherwise not an appropriate third-party custodian.   The magistrate court rejected these arguments and ordered the defendant released.   The government orally moved for a stay pending appeal, which the court granted.

---

[12] In *Dhavale*, then–Chief Judge Howell found every factor weighed in favor of detention and that the defendant had not rebutted the statutory presumption of detention.  *See Dhavale*, 2020 WL 1935544, at *4.  Despite reversing the magistrate court's decision to issue release conditions under 18 U.S.C. § 3142(c), then–Chief Judge Howell permitted the temporary release of the defendant under 18 U.S.C. § 3142(i), given the defendant's health issues and the nascent COVID-19 pandemic.  (The order was issued April 21, 2020.)

On July 10, 2024, the magistrate court docketed proposed release conditions.  (ECF No. 11).  The court also entered a Minute Order explaining the basis for its decision.

On July 11, 2024, this Court set a hearing on the government's appeal for July 17, 2024, and issued a briefing schedule.  The government now respectfully submits this Motion for Review.

## LEGAL STANDARD

Title 18, United States Code, Section 3145(a) provides:

(a) **Review of a release order** - If a person is ordered released by a magistrate, . . .

(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the magistrate court's denial of pretrial detention.  Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to have analyzed the issue has concluded the standard is *de novo*.  *See United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *5 & n.2 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (citing decisions from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that stand for this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument.  It may take additional evidence from new witnesses or consider arguments not raised previously.  In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Under the Bail Reform Act, if the Court determines that "no condition or combination of

conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, Congress has specified that for an offense involving a minor victim under Section 2423, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th

Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

## ARGUMENT

For reasons that follow, the defendant poses an unmitigable risk to community safety. Because there are no conditions of release adequate to reasonably assure community safety, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

### I.     The Statutory Factors All Weigh Heavily in Favor of Detention.

#### A.   Nature and Circumstances of the Charged Offense

The nature and circumstances of the charged offense weigh heavily in favor of detention.

Contrary to the defendant's post hoc, self-serving claims, he was not merely roleplaying. "This defendant did not simply express an interest in a sexual encounter with a minor, and he did not simply make arrangements for a sexual encounter with a minor, but he took the affirmative, unequivocal step of driving his vehicle into the District of Columbia to arrive at the appointed time and place." *United States v. Breeden*, No. 15-MJ-506, 2015 WL 13310427, at *7 (D.D.C. Nov. 16, 2015) (Berman Jackson, J.). Indeed, the charged offense both **(i)** is a crime of violence that serves as the basis for the statutory presumption of dangerousness and **(ii)** involves a minor victim. The Court is required to consider both of these factors in assessing the nature and circumstances of the offense. *See* 18 U.S.C. § 3142(g)(1) ("The judicial officer shall . . . take into account the available information concerning— the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim . . . ."); *Breeden*, 2015 WL 13310427, at *7 ("Congress specifically directed courts to consider whether a defendant is charged with a 'crime of violence' when assessing the nature and circumstances of the offense factor, and it designated a violation of section 2423(b) to be a crime of violence."); *accord United States v. Johnston*, No. 17-MJ-46, 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017) (Howell, C.J.) (noting that a violation of Section 2423(b) "is a serious crime" subject to a rebuttable presumption of detention); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) ("With respect to the nature and circumstances of the offense, the charged offense is serious and involved traveling with intent to have sex with a twelve year-old minor victim. The Court finds that this factor supports detaining the defendant; indeed, it is the basis for the presumption in favor of detention.") (Bates, J.).

The seriousness of the offense is also reflected by Congress's judgment that those convicted of the charged offense face up to 30 years' imprisonment upon conviction. *See* 18 U.S.C. § 2423(b); *Johnston*, 2017 WL 4326390, at *4 (considering, as factors weighing in favor of

detention, that a conviction "allows for imprisonment up to 30 years" and that "the defendant may face substantial prison time"). Indeed, the United States Sentencing Guidelines also reflect the serious nature of the offense with which the defendant has been charged. Based on the conduct known to the government at this early stage of the case, the government estimates the defendant's total Offense Level under the Guidelines to be 36, yielding an estimated Guidelines range of 188 to 235 months' imprisonment (i.e., approximately 15.66 to 19.58 years' imprisonment), which further reflects the very serious nature of the offense conduct. *See* USSG §2G1.3(a)(3) (base offense level of 28); USSG §2G1.3(b)(5) (eight-level enhancement for minor victim under 12).

Accordingly, the nature and circumstances of the charged offense weigh heavily in favor of detention.

**B.  The Weight of the Evidence Against the Defendant**

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention. The evidence against the defendant in this case is strong. As detailed above, the defendant met an OCE through a fetish website, and the FBI was able to identify him based on information he provided when he registered his account with that site. The defendant engaged in extensive conversations with the OCE over an encrypted messaging application about his sexual interest in children and, specifically, his interest in sexually abusing the agent's purported six-year-old daughter. Shortly before traveling into the District of Columbia to meet the OCE, the defendant stated he wanted to "tickle her and grip her and molest her and kiss her then watch you too a bit then get comfy and lick her and rub my tip." He then said, "Yeah, so that's what I want" and said, "There, no more hesitation or indecisiveness." He also discussed wanting to start things off by bathing with the child and said that he would not shower after work. The defendant then actually traveled into the District of Columbia for the purpose of raping the child.

After this arrest, the defendant then admitted to meeting the OCE online, talking to him

online, and driving from Maryland to meet him at a bar in the District of Columbia.   His self-serving assertion that this was all "roleplay" is belied by the substance of his messages with the OCE and the fact that he traveled from Maryland into the District of Columbia to meet with the OCE at the appointed time and place.   When the OCE told the defendant that it was time to go to the child, the defendant got up and paid for both of their beers and then walked out with the OCE. "But for the fact that defendant was communicating with an undercover officer, defendant could have come face-to-face with a minor and a willing parent."   *Breeden*, 2015 WL 13310427, at \*8.

While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25, 2023 WL 1778194, at \*8 (D.D.C. Feb. 6, 2023) (Howell, C.J.).   Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate."   *Id.* at \*10.   In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision.   *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).   The Second Circuit had earlier reached the same decision after a thorough and careful analysis of the issue.   *United States v. Zhe Zhang*, 55 F.4th 141, 149–50 (2d Cir. 2022).   This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true."   *Blackson*, 2023 WL 1778194, at \*10.   This is such a case, and the weight of the evidence favors detention.

### C.  <u>The History and Characteristics of the Defendant</u>

The defendant has admitted to having a sexual interest in children, claimed to have recently molested an eight-year-old girl, and traveled into the District of Columbia with the intent of sexually abusing a six-year-old girl.  He also indicated that he has previously viewed child pornography but was careful to avoid detection.  While the defendant had pointed to positive characteristics in arguing for release, such as his prior employment and family support, those positive factors did nothing to prevent him from taking affirmative steps to sexually abuse a six-year-old girl.

Although the defendant appears to have minimal criminal history, the absence of prior criminal history is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case.  *See, e.g. Breeden*, 2015 WL 13310427, at *7 ("But the inferences the defendant is asking the Court to draw do not go far enough.  The Court is not certain that a lack of *more* incriminating evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made").

Accordingly, this factor also weighs strongly in favor of detention.

### D.  <u>The Nature and Seriousness of the Danger to Any Person or the Community</u>

The evidence in this case establishes that the defendant poses a grave danger to the community.  As discussed above, the defendant claims to have recently molested an eight-year-old girl and is charged with traveling across state lines into the District of Columbia to rape a six-year-old girl.  In addition, "the fact that the defendant poses a danger is presumed and is to be

factored into the statutory analysis, even if some contrary evidence has been adduced." *Breeden*, 2015 WL 13310427, at *9 (citing *Stone*, 608 F.3d at 945–46).

As set forth below, the released conditions proposed by the magistrate court are inadequate to mitigate the danger posed by the defendant's release. They are also untenable.

## II.    The Magistrate Court's Release Order Should be Reversed.

The magistrate court's release order should be reversed. The magistrate court's proposed release conditions rely on a strained comparison to a factually dissimilar case and are inadequate to protect the community from this defendant. And more generally, a third-party custodian cannot reasonably assure community safety here.

### A. The Magistrate Court's Proposed Release Conditions Are Inadequate to <u>Protect the Community from this Defendant.</u>

From the outset of the proceedings, the magistrate court suggested it would entertain release on conditions like those in *United States v. Willis*, a case in which then–Chief Judge Howell had previously affirmed its release of someone charged with a child sexual exploitation offense. Because those conditions do not exist in this case, the magistrate court gave the defendant two opportunities over the course of a month to try to bring them about.

The magistrate court erred because case is distinguishable from *Willis*, both in terms of the defendant's alleged criminal conduct and the potential viability of the proposed release conditions. In *Willis*, the defendant communicated with a 14-year-old girl online and sought to entice her to have sex with him. While the defendant's conduct certainly was serious, it was entirely online: he never traveled across state lines to act upon his predatory online behavior. The defendant in this case, on the other hand, actually traveled across state lines into the District of Columbia to rape a six-year-old girl—demonstrating his willingness to hurt a child. That makes this case much closer to *Dhavale*, as discussed above. In *Dhavale*, then–Chief Judge Howell found every factor weighed

in favor of detention and that the defendant had not rebutted the statutory presumption of detention. *See Dhavale*, 2020 WL 1935544, at \*4.  The defendant in *Dhavale* was released only temporarily, after a year of detention, at the very outset of the COVID-19 pandemic.  The magistrate court erred here in not fully considering the nature and circumstances of *this* case and the meaningful ways in which it differs from *Willis*.

Second, the defendant in *Willis* sought to present a viable, multi-pronged release plan and submitted a substantial number of supporting materials to the magistrate court.  *See* ECF Nos. 7, 9 & 11 and exhibits thereto, *United States v. Willis*, 22-MJ-122.  No such plan has been presented here, and there are serious questions about the viability—even in the short-term—of the magistrate court's proposed release conditions.  For example, the defendant in *Willis* was released to the custody of both of his parents, who were retired and resided in Michigan at a home they had owned for over 30 years.  That set of circumstances does not exist in this case.  Instead, the defendant's mother will be required to quit her job and rent a second home more than 50 miles from the District of Columbia, where another jurisdiction can perform home visits.  She would be required to stay there alone with the defendant and would not be able to leave the house unless her husband were to take leave from work and travel from Bowie, Maryland, to relieve her of her duties.  None of the proposed residences is as stable as in *Willis*; at least one of the proposed homes is a short-term rental on Vrbo.com, a vacation rental site.  Moreover, all the proposed properties appear to be in remote, rural areas, which may make home visits burdensome.  And because the defendant's family is required both to lose a source of income and to rent an additional property, the long-term viability of this plan is questionable.

The defendant in *Willis* had also retained a psychologist for a psychosexual evaluation and agreed to begin sex offender treatment, which were incorporated into his release conditions.  When the government raised this distinction in the magistrate court, the defense stated in passing that it

was open to an evaluation, and the defendant's mother acknowledged that he "needs help." But the defendant has put forth no such proposal here, and the magistrate court did not order any such conditions. In *Willis*, there was at least an attempt to assess the defendant's risk and to enroll him in treatment with the goal of rehabilitating him and mitigating his risk to the community.

In its Minute Order, the magistrate court cited *United States v. Peksa*, No. 19-CR-350; *United States v. Johnston*, No. 20-CR-083; and *United States v. Roberson*, No. 21-CR-102, as supporting its release conditions. But these cases are even more dissimilar than *Willis*. None of these cases involves an attempt to rape a minor, let alone travel across state lines to do so. In *Peksa*, the defendant was charged with receiving and accessing child pornography after he was caught viewing child pornography on his phone at work. In *Johnston*, the defendant was charged with distributing child pornography over a peer-to-peer network. And in *Roberson*—a case in which the government did not seek pretrial detention—the defendant distributed child pornography via email. The magistrate court's reliance on factually dissimilar cases was in error.

Because the magistrate court did not adequately consider the nature and circumstances of this offense, relied on cases involving dissimilar conduct, and has proposed release conditions that are inadequate to protect the community, the magistrate court's release order should be reversed.

## B.  **A Third-Party Custodian Could Not Assure Community Safety Here.**

Given the nature and circumstances of this offense, no third-party custodian could reasonably assure community safety. In *United States v. Hoppe*, No. 23-CR-102, the defendant traveled to a hotel in Virginia intending to rape an eight-year-old girl. The defendant sough to be released to home incarceration under the custodianship of her aunt. Judge Contreras rejected that proposal as wholly inadequate to assure community safety given the nature of the allegations:

> The Court is not convinced that these proposed conditions would reasonably
> mitigate the risk Defendant's release would pose to the community. First, it is
> generally true that, in cases "involving illicit online conduct involving a minor, a

> defendant cannot establish that an appropriate third-party custodian exists, since, given the ubiquity of internet-capable devices, ensuring against continuing illegal conduct on release often presents insurmountable challenges." *United States v. Dhavale*, No. 19-mj-92, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). That principle applies foursquare here. Defendant's papers make clear that her proposed third-party custodian has multiple internet-capable devices in her home, including a computer, an iPad, and a cellphone. *See* Def.'s Suppl. Mot. at 3. Defendant asserts that these devices would be difficult to access for multiple reasons. *See id.* But Defendant does not assert that her aunt would be able to monitor her at all hours of the day. Nor is the Court persuaded that Defendant would be unable to access any other internet-capable devices. Defendant "needs only a hand-held device to access and/or distribute child pornography." *See Galarza*, 2019 WL 2028710, at *6. And because Defendant's aunt cannot provide round-the-clock monitoring, "the absence of such small devices in [Defendant's aunt's] residence cannot be meaningfully verified on a continuous basis." *See id.*

*United States v. Hoppe*, No. 23-CR-102, 2024 WL 1990452, at *6 (D.D.C. May 6, 2024) (Contreras, J.). The same concerns apply here. While the magistrate court ordered that there be no devices inside the rental property and that the defendant's mother use only a flip-phone, the defendant's mother "cannot provide round-the-clock monitoring," and even with occasional home visits, "the absence of such small devices in [the] residence cannot be meaningfully verified on a continuous basis."

Even if a third-party custodian were a viable option in a case such as this, the defendant's mother—although well intentioned—is not an appropriate candidate. The defendant lived with his mother at the time he committed the charged offense. His mother has demonstrated that she is willing to go to great lengths—including quitting her job and renting another home—in order to secure the defendant's release from the D.C. Jail. While it is understandable that the defendant's mother wants him home, the burdens she is willing to assume also speak to her lack of distance and objectivity. Moreover, the long-term viability of the proposed arrangement is questionable for the reasons discussed above.

Indeed, district courts in this jurisdiction have recognized the challenge faced by third-party custodians—who are essentially being asked to act as correctional officers 24 hours a day for

someone about whom they care deeply—and have repeatedly rejected such arrangements as inadequate to reasonably assure community safety.  *See, e.g.*, July 24, 2023, Hr'g Tr. 24:14–25, ECF No. 20, *United States v. Gorham*, 23-CR-206 (D.D.C. Aug. 17, 2023) (Berman Jackson, J.) ("I'm concerned that she doesn't have the distance or independence to be his supervisor, and essentially his jailer, after being under U.S. Probation Office supervision while married to her wasn't enough to do the trick.  And I'm not sure it's appropriate to put her in the position of searching his car every day."); Order at 9, ECF No. 54, *United States v. Cunningham*, 23-CR-7 (D.D.C. Mar. 13, 2023) (Cobb, J.) (same) ("[A] third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant.  Nor should a third-party custodian be cast in the role of jailer.  To do so is neither realistic nor fair to the custodian. . . . [The defendant's] custodians cannot supervise his behavior on a 24/7 basis."); Order at 14, ECF No. 18, *United States v. Wright*, 22-CR-410 (D.D.C. Dec. 23, 2022) (Cooper, J.) (same) ("But family members are not correctional officers.  Nor should they be expected to play that role"); Order, ECF No. 14, *United States v. Joyner*, 22-CR-252 (D.D.C. Aug. 3, 2022) (McFadden, J.) (same); Order, ECF No. 55, *United States v. Handy*, 22-CR-164 (D.D.C. June 21, 2022) (Walton, J). (same), *aff'd*, Case No. 22-3045 (D.C. Cir.).

And in *Blackson*, then–Chief Judge Howell reversed the magistrate court's release order and discussed the inadequacy of a similar third-party custodian arrangement:

> The proposed conditions impose responsibilities similar to those of full-time and professional employees at detention facilities, but without the benefit of shifts or breaks in service as custodian.  Defendant's mother's capability to uphold those conditions long-term is questionable.  Certainly, the Magistrate Judge attempted to assuage skepticism about the long-term ability of defendant's mother to fulfill all the proposed conditions, and defendant's mother obliged by affirming her willingness and ability to do so.  Regardless of whether defendant's mother is a pillar of the community with ties to local government and law enforcement, she was and has been part of defendant's support community that unsuccessfully kept him out of the court system following his release only last May.  She is currently permitted to work from home for "maybe two or three months for now" and after that, she will have to

"see" about her ability to work remotely every day.  Defendant argued that other individuals were approved as third-party custodians to cover gaps in his mother's availability, but that risks inconsistency in the conditions of home incarceration that, as of now, are completely placed on his mother.  To be clear, a benefit of professional detention facilities is the consistency in insuring detention conditions. Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings.

*Blackson*, 2023 WL 1778194, at *12 (record citations omitted).

Here, while the government does not challenge the sincerity of the defendant's mother, it does not believe she can serve as viable and plausible third-party custodian.  The defendant lived with his mother at the time he made plans online to rape a six-year-old girl and then traveled into the District of Columbia to do so; her ability to ensure the defendant's compliance with the law is unproven at best.  She also has an obvious personal interest in ensuring that the defendant remains on release.  And she will be required to quit her job and essentially live under house arrest in a rental property that has not yet been secured, able to leave only if her husband can take time off of work and come to relieve her.  This arrangement places an unrealistic burden on the defendant's mother and unacceptably "risks inconsistency in the conditions of home incarceration."  *Blackson*, 2023 WL 1778194, at *12.

## CONCLUSION

For the foregoing reasons, the magistrate court erred in setting conditions of release. Nothing short of detention is adequate to protect the community in this case.  The government respectfully requests that this Court reverse the magistrate court's release order and detain the defendant pending trial.

26

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

Dated: July 12, 2024          By:   */s/ Paul V. Courtney*
                                    Paul V. Courtney
                                    D.C. Bar No. 1034252 / N.Y. Bar No. 5392337
                                    Assistant United States Attorney
                                    United States Attorney's Office
                                    for the District of Columbia
                                    601 D Street NW
                                    Washington, D.C. 20530
                                    (202) 252-1719
                                    Paul.Courtney@usdoj.gov