UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NATHANIEL LAMAR NELSON SCOTT,<br><br>*Defendant.* | No. 24-cr-287 (DLF) |

**MEMORANDUM OPINION & ORDER**

Before the Court is the government's Motion to Review the Release Order of Nathaniel Lamar Nelson Scott ("Gov't. Mot. for Review"). Dkt. 12. Scott is charged by indictment with traveling across state lines with intent to engage in illicit sexual conduct with a six-year-old girl, in violation of 18 U.S.C. § 2423(b). Dkt. 5. On July 8, 2024, the Magistrate Judge ordered Scott released pending trial, and imposed release conditions including 24/7 home confinement under his mother's custody, a ban on all internet-connective devices, and home visits by Pretrial Services. *See* Minute Order of July 10, 2024. The Magistrate Judge also stayed his order pending appeal. *Id.* The government appeals, arguing that Scott poses an unmitigable risk to community safety. Gov't. Mot. for Review at 1–2; *see* 18 U.S.C. § 3142(e). Based on the entire record, including the evidence and arguments presented at the June 10, June 27, and July 8 hearings before the Magistrate Judge, as well as during the July 17 hearing before the Court, the Court will grant the government's motion and order Scott detained pending trial.

**I.    BACKGROUND**

    **A.    Factual Background**

In May of 2024, Scott met an FBI undercover agent on a fetish website, in a forum dedicated to connecting users interested in communicating over certain end-to-end encrypted

messaging applications.  *See* Government's Mem. in Support of Pretrial Detention ("Gov't. Detention Mem.") at 2, Dkt. 4.  The agent had made public posts on the fetish site, referring to himself as a "kinky daddy" and stating that he was looking for "very open-minded people" to explore similar interests.  *Id.* at 2.  After Scott sent the agent a direct message asking "So what are you looking to do with a perverse Daddy ?," the agent provided Scott with his username on an end-to-end encrypted application that was only viewable by chat participants.  *Id.* at n.1.

From May 25 through June 5, 2024, Scott and the agent repeatedly messaged through the encrypted application and discussed the sexual abuse of prepubescent children.  *Id*. at 4, 6.  The agent represented that he had a six-year-old daughter, whom he was actively sexually abusing:

> **SCOTT:** And I like em young
> **AGENT:** Mine is 6 [**SCOTT** reacted with a heart symbol]
> **SCOTT:** That's the perfect age
> **AGENT:** Yes
> **SCOTT:** 6 is one of my fav numbers
> **SCOTT:** I seen Half that
> **SCOTT:** I had a few young sluts I groomed
> **SCOTT:** But never been lucky enough to play irl
> **SCOTT:** Just hoping one day I can find a p[e]do mommy or p[e]do daddy that will let me play with them or have my own 1 day

*Id.* at 3–4.  Scott asked the agent a series of questions about the purported abuse, including the nature and extent of the sexual acts, details about the agent's daughter's body type and genitals, whether she was still a virgin, and whether the agent had ever let "someone else play" with her. *Id.* at 6–7.  During these conversations, the agent sent Scott photos, including of a penis next to a pair of child-sized underwear and of his purported daughter with her shirt raised.  *Id.* at 8.  Scott told the agent that he had only had one in-person encounter with a child.  He claimed he had recently molested an eight-year-old girl—"just took a risk and tickled her" and "touched her all over"—during a game of hide-and-seek.  *Id*. at 8.  Scott expressed interest in having an existing abuser teach him the ropes, stating: "[I]t would be hot for a mommy or daddy like you to kind of

2

groom me in a sense to be more and more depraved. I'm cautious about it still, but taking to you is very seducing and exciting." *Id.* at 7.  Law enforcement identified Scott through information provided by the fetish website, including two Google email addresses, a verified telephone number with a (443) Maryland area code, and a date of birth of July 15, 1988, later determined to be Scott's. Statement of Facts at 8, Dkt. 2-1.

On the morning of June 5, 2024, the agent messaged Scott that his daughter would be with him later that day.  Gov't. Detention Mem. at 7.  Scott and the agent discussed meeting up that evening so that Scott could participate in abuse of the child.  *Id.*  Scott expressed hesitation and concerns about being caught, but reassured the agent he would not back out:

> **AGENT:** But again, It sounds like your either skeptical or u[n]sure of what u would want to do, so I don't know. I went through it with the last guy. His suggestion was to meet at a public place close to my apartment and have me FaceTime her with him next to me with her pulling her shirt up or taking her pants off
>
> **SCOTT:** When [you] say unsure, like you mean what I want to do in person or what?
>
> **AGENT:** Yes
>
> **SCOTT:** Like you, I don't want to get caught of[ course] so yeah I'm cautious and nervous about that but I was also just trying to be respectful and not "pushy" but maybe I'm fucking up lol
>
> **AGENT:** lol I understand
>
> **SCOTT:** Yes if we are in person I'd want to introduce and maybe tickle her and grip her and molest her and kiss her then watch you too a bit then get comfy and lick her and rub my tip with you there to encourage me to embrace it and hope she has fun
>
> **AGENT:** Mmmm that would make me so hard
>
> **SCOTT:** Yeah, so that's what I want
>
> **SCOTT:** There, no more hesitation or indecisiveness

*Id.* at 7–8.

After Scott and the agent decided to meet at a bar in Northwest Washington, D.C., near the agent's purported apartment, Scott drove from his residence in Maryland into D.C. *Id.* at 8. At approximately 6:59 p.m., Scott entered the bar, stopped in the bathroom, and then approached the agent to introduce himself and order beers for the two of them. *Id.* After a brief conversation, the agent told Scott that they needed to head back to the apartment because his six-year-old daughter was home alone. *Id.* Scott acknowledged the agent's concern, paid the tab, and followed the agent out of the bar. *Id.* Upon exiting, Scott was arrested for traveling interstate to engage in illicit sexual conduct with a minor. *Id.*

After waiving his *Miranda* rights, Scott admitted that he had met a man (whom he still did not know was an undercover agent) through a fetish website and that he had messaged him through a third-party encrypted application. Scott also admitted that he had driven from Maryland to the District of Columbia to meet the man. *Id.* at 9. Although he denied knowing the age of the child he was going to meet, he stated that he knew that the child was "probably too young to be left home alone." *Id.* When confronted with the evidence supporting the charged offense, Scott denied committing the offense. He also offered multiple contradictory explanations for his actions: that he was interested in age-based role play and meeting others with similar sexual fantasies; that he was "concerned" about the undercover's fictional six-year-old; and that he had changed his mind during the conversation and intended to leave upon exiting the bar. *Id.*

## B. Procedural History

After his June 5 arrest, Scott appeared before the Magistrate Judge the following day on a criminal complaint, Dkt. 1. *See* Minute Order of June 6, 2024. At that time, the government moved to detain Scott pending trial, arguing that he posed unmitigable risks to community safety.

4

Gov't. Detention Mem. at 12; *see* 18 U.S.C. § 3142(e), (g). The Magistrate Judge held three separate hearings on the government's motion.

At the initial detention hearing on June 10, the defense proposed that Scott be released to home confinement at his parents' residents in Bowie, Maryland. *See* Gov't. Mot. for Review at 11. The government opposed, raising concerns that Scott had been living in his parents' home at the time of his offense; that internet devices would be potentially accessible; and that D.C. Pretrial Services does not do home visits to ensure compliance with release conditions. *Id.* Pretrial Services indicated that Scott would need to live more than 50 miles from D.C. in order for another District to assume courtesy supervision and perform home visits. *Id.* Relying on *United States v. Willis*, No. 22-MJ-122—a child sex abuse case in which then-Chief Judge Howell released a defendant to 24/7 home confinement, coupled with an internet ban and home visits by a Pretrial Officer—the Magistrate Judge indicated he would be open to releasing Scott under similar conditions.

On June 27, at the second detention hearing, the defense presented a list of several apartment units located more than 50 miles from D.C. where Scott could serve home confinement with an internet ban and home visits by a Pretrial Officer. *Id*. The Magistrate Judge found that an apartment community was inappropriate, because of the likely presence of children and of open Wi-Fi connections. He gave the defense until July 8 to identify a more isolated residence.

On July 8, the defense presented its final proposed release conditions patterned after *Willis*. The defense offered a list of six single-family rental properties located in isolated parts of Virginia, Maryland, and Pennsylvania. Scott's mother testified that she was prepared to quit her part-time job, rent an isolated property, and supervise Scott full-time. The Magistrate Judge ordered Scott released pending trial and imposed conditions of release mirroring *Willis*, including "no visitors of

5

any kind, no internet connected devices, no internet connection at all, and that [Scott's mother] would conduct daily searches of the resident and defendant to ensure that there was no contraband." *See* Minute Order of July 10, 2024; Proposed Order Setting Conditions of Release, Dkt. 11.  The government orally moved for a stay pending appeal, which the Magistrate Judge granted.  *See* Minute Order of July 10, 2024.

This Court held a hearing on the government's appeal on July 17, 2024.  At that hearing, the government entered into evidence exhibits of the end-to-end encrypted messages between Scott and the agent, as well as a video of Scott's post-arrest custodial interview.  *See* July 17, 2024 Hearing Tr. at 26:4–6 (admission of exhibits).  Scott's mother again testified in-person.  She reiterated that she was willing to stop her part-time job, rent an isolated property over 50 miles from D.C., obtain a lockbox for her phone and guarantee the absence of other internet-connective devices, and supervise her son on a round-the-clock basis.  She explained that she would take seriously her obligation to report violations and that the defendant's stepfather—an IT employee for the Department of Justice—could intermittently take over supervision should she need to leave the property.  The defense asked the Court for additional time to submit a supplemental brief, which counsel filed on August 7, 2024.  *See* Dkt. 15.

## II.     LEGAL STANDARD

The Bail Reform Act "provides that a judge 'shall order' the 'detention of the [defendant] before trial,' if after a detention hearing . . . and consideration of 'the available information concerning' enumerated factors, . . . 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Howard*, 20-mag-181, 2020 WL 5642288, at *2 (D.D.C. Sept. 21, 2020) (quoting 18 U.S.C. §§ 3142(e)(1), (f), and (g)).  "Even if [the] defendant

does not pose a flight risk, danger to the community alone is a sufficient reason to order pretrial detention." *United States v. Lee*, 195 F. Supp. 3d 120, 124 (D.D.C. 2016).  In determining whether any combination of conditions will assure the safety of the community, the Court must consider four statutory factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. § 3142(g).

The Court applies a *de novo* standard of review when evaluating a magistrate judge's detention order, *see United States v. Henry*, 280 F. Supp. 3d 125, 128 (D.D.C. 2017), and it "is free to use in its analysis any evidence or reasons relied on by the magistrate judge" as well as "hear additional evidence and rely on its own reasons," *United States v. Hubbard*, 962 F. Supp. 2d 212, 215 (D.D.C. 2013) (quoting *United States v. Sheffield*, 799 F. Supp. 2d 18, 18–19 (D.D.C. 2011)).  The government bears the burden of proving by "clear and convincing evidence" that a defendant's dangerousness warrants pretrial detention.  *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).  But Congress has specified that for certain offenses involving a minor victim, including the charge here, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E).  The presumption of detention "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."  *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).  If a defendant produces credible evidence, the presumption still "remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained."  *United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2011).  Although the presumption shifts the burden of production

7

to the defendant, the government still bears the ultimate statutory burden of persuasion, "which is consistent with the presumption of innocence." *United States v. Breeden*, 2015 WL 13310427 (D.D.C. Nov. 16, 2015) (citing *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985)). The presentation of hearsay evidence is permitted, and the parties may proceed by proffer. *See United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).

### III.   ANALYSIS

Due to the charged offense, *see* 18 U.S.C. § 2423(b), Scott is presumptively dangerous under § 3142(e)(3)(E) of the Bail Reform Act. The record establishes—and Scott does not dispute—there is probable cause to believe that he intended to meet up with an undercover agent to sexually abuse a purported six-year-old girl, and that he traveled across state lines to do so. *See* Statement of Facts at 7. Considering the seriousness of Scott's conduct and the lack of mitigating circumstances, the Court finds that Scott has not rebutted the presumption of dangerousness. Weighing all of the § 3142(g) factors, the Court concludes that Scott poses an unmitigable risk to community safety and must be detained.

### 1. The Nature and Circumstances of the Offense

The nature and circumstances of the offense weigh heavily in favor of Scott's detention. The charged offense is extremely serious, as reflected in both the presumption of detention applied to the offense, *see* 18 U.S.C. § 3142(e)(3), and the statutory maximum sentence of up to 30 years' imprisonment, *id.* § 2423(b); *see United States v. Johnston*, No. 17-MJ-46, 2017 WL 4326390, at *4 (D.D.C. Sept. 28, 2017) (30-year statutory maximum for § 2423(b) violation reflects seriousness of the offense).

The alleged facts of the offense conduct are aggravated as Scott took numerous concrete steps—including driving his vehicle from Maryland into D.C. and following an undercover agent

out of a bar to go to the agent's purported residence—in order to sexually abuse a prepubescent child. Scott's travel across state lines makes this case markedly distinguishable from child sex abuse cases involving purely digital acts. *See United States v. Breeden,* No. 15-MJ-506, 2015 WL 13310427, at *7 (D.D.C. Nov. 16, 2015) ("[T]he fact that this is a travel case distinguishes it from every other case provided by the defense in which release was granted."); *United States v. Dhavale*, 2020 WL 1935544, at *1 (D.D.C. Apr. 21, 2020) (finding § 3142(g) factors satisfied where defendant actually traveled across state lines intending to have sex with a 13-year-old girl); *United States v. Hoppe*, 2024 WL 1990452, at *3 (D.D.C. May 6, 2024) (finding pretrial detention warranted because of "the detailed plans [the defendant] made, and the concrete steps she took" in traveling to Virginia to sexually abuse an eight-year-old).

Adding to the seriousness of the offense is the intended victim's young age. When the undercover agent informed Scott through encrypted message that his purported daughter was only six years old, Scott responded by saying "That's the perfect age." Scott's messages also demonstrated a clear intent to follow through with a sexual encounter with the young child. For example, he stated that he had recently molested an eight-year-old girl, and he described in detail how he intended to "molest" the agent's daughter; he even added that there was "no more hesitation or indecisiveness." Both the severity and specific circumstances of Scott's offense weigh heavily in favor of detention.

### 2. The Weight of the Evidence

The weight of the evidence is strong. Where, as here, "the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C.

9

2018). As described above, the FBI identified through multiple corroborating sources, including email addresses and a verified phone number, that Scott was the individual sending messages to the undercover agent, and Scott himself confirmed as much during his post-arrest interview.

Scott's messages explicitly detail his interest in abusing the purported six-year-old, and they contain nude photographs that only further corroborate his intent. Among other things, Scott sent the undercover agent images of his own genitalia to "validate" that Scott was a real person. Gov't. Detention Mem. at 7. In contrast to the implausible explanations that Scott provided to law enforcement following his arrest, his encrypted messages show that he intended to sexually abuse—rather than merely engage in fantasy play with—the child. It is true that Scott sent the undercover agent a message that expressed an interest in role playing a doctor's visit with the child, but that message followed many others in which Scott made clear he had every intention of sexually abusing the six-year old. Indeed, Scott stated that he had "seen [h]alf of that," referencing the child's age of six. He added that he "had a few young sluts [he] groomed. But never been lucky enough to play irl." He also stated that he had recently molested an eight-year-old girl, although he later told the agents that he was simply trying to ingratiate himself to the agent. *See* Gov't. Mot. for Review at 7 n.9. After sending these messages, Scott traveled from Maryland to the District of Columbia to meet the undercover agent at a bar, with the understanding that they would travel together to the agent's home. When the agent told Scott at the bar that he needed to get home to his six-year-old daughter, Scott acknowledged and followed the agent out of the bar.

The encrypted messages and unrebutted government proffer, which strongly support the elements of the charged offense, strongly favor detention.

3. **The History and Characteristics of the Person**

The third factor—the history and characteristics of the defendant—is neutral. Some considerations fall in Scott's favor, such as the fact that Scott has no criminal history and has never previously been arrested or detained. *See* Opp'n at 10–11. But the absence of criminal history alone cannot rebut the statutory presumption of dangerousness where the surrounding circumstances are so indicative of culpability. *E.g.*, *Breeden*, 2015 WL 13310427, at *7 (defendant with no criminal history detained for dangerousness); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) (same).

Other personal characteristics weigh in Scott's favor. He is a college graduate who has no history of drug or alcohol abuse. *See* Opp'n at 10–11. At the time of his arrest, he was employed as an advocate working to prevent tenants from being evicted. *Id.* He also asserts ties to his community and has a strong network of familial support, including his mother and stepfather who have appeared in-person at multiple detention hearings.

On the other hand, the statements that Scott made to the undercover agent in encrypted messages are deeply troubling. As noted, he told the agent that he had molested an eight-year-old girl during a game of hide-and-seek. Scott later contended during his custodial interview that this story was merely a fantasy he made up to ingratiate himself with the agent. *See* Gov't. Mot. for Review at 7 n.9. Presumably, Scott would say the same with respect to other encrypted messages, in which Scott indicated that he had seen girls "[h]alf of that" and that he "had a few young sluts [he] groomed. But never been lucky enough to play irl." Regardless, the Court finds his

11

explanation for the message about the eight-year-old girl as implausible as his other fantasy and role playing explanations.

On balance, the Court finds that Scott's history and characteristics weigh neither in favor nor against detention.

### 4. The Nature and Seriousness of the Danger to the Community

Finally, the nature and seriousness of the danger that would be posed to the community if Scott were released cuts in favor of his continued detention. That Scott poses a danger to the community is presumed under statute, *see* 18 U.S.C. § 3142(e)(3)(E), and should be factored into the analysis even if some contrary evidence is presented, *Ali*, 793 F. Supp. 2d at 388. Scott's conduct reflects that he poses a danger to "a particularly vulnerable segment of the community: children." *United States v. Hoppe*, 2024 WL 1990452, at *3 (D.D.C. May 6, 2024) (citing *United States v. Burdette*, 813 F. Supp. 2d 1, 4 (D.D.C. 2011)). Furthermore, the digital nature of Scott's crime poses heightened risks to community safety. As courts have recognized, the challenges in preventing electronically-based child sex crimes are often "insurmountable," "given the ubiquity of internet-capable devices." *Dhavale*, 2020 WL 1935544, at *5.

The Court in no way questions the veracity and sincerity of Scott's mother's representations to the Court that she will supervise Scott and report any known violation of the conditions set by the Court. Instead, the Court questions the ability of *any* third-party custodian to provide the round-the-clock monitoring necessary to ensure absence of "small [internet-accessible] devices in [the] residence." *Hoppe*, 2024 WL 1990452, at *6. It is admirable and a testament to her relationship with her son that Scott's mother is willing to stop her work entirely and rent a second home 50 miles from D.C. to supervise him. At the same time, her seeming receptivity to Scott's fantasy and role playing explanations is concerning, *see* July 17, 2024

Hearing Tr. at 43:11–18 (volunteering that her son has always been "imaginative" and "an artist"), as is the fact that Scott was residing in his mother's home at the time he took steps to commit the charged offense, *see United States v. Blackson*, 2023 WL 2663034, at *1 (D.C. Cir. Mar. 28, 2023) (defendant's mother inadequate as a third-party custodian where "she was and has been part of defendant's support community that unsuccessfully kept him" from offending).

Finally, while the Court recognizes that the proposed conditions are patterned after the conditions set in *Willis*, a number of distinctions exist between *Willis* and this case. Unlike the defendant in *Willis*, who was released to the custody of two retired parents at their home, Scott would be released to his mother to keep an eye on him around the clock, with occasional support from his stepfather. The Court appreciates that Scott's family does not have the same financial resources as the defendant in *Willis* to finance a full psychosexual review and sex offender therapy. But unlike Scott, Willis himself proposed receiving treatment, while Scott has not affirmatively proposed seeking help. *See* July 17, 2024 Hearing Tr. at 31:23–32:5. Moreover, in this case, the Court is not convinced that *any* proposed release conditions could feasibly and effectively mitigate Scott's dangerousness to the community.

For all of the above reasons, the Court finds that Scott poses a serious danger to the community that cannot be reasonably mitigated by the proposed conditions of release.

## CONCLUSION

Based on consideration of the record and the factors set forth in 18 U.S.C. § 3142(g), the Court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of . . . the community" if the defendant were to be released, *id.* § 3142(e).

Accordingly, it is hereby

**ORDERED** that the government's Motion for Review of Release Order, Dkt. 12, is **GRANTED**; and it is further

**ORDERED** that the defendant is **DETAINED** pending trial.

August 21, 2024

_____
DABNEY L. FRIEDRICH
United States District Judge